385 So.2d 19 (1980)
Lloyd WEYSHAM, Jr. and Louis Weysham
v.
NEW ORLEANS PUBLIC SERVICE, INC.
No. 11046.
Court of Appeal of Louisiana, Fourth Circuit.
May 13, 1980.
Rehearing Denied July 3, 1980.
*20 James Maher, III, New Orleans, for defendant-appellant.
Zelden & Zelden, Frederick W. Wild, III, New Orleans, for plaintiffs-appellees.
Before GULOTTA, SCHOTT and CHEHARDY, JJ.
GULOTTA, Judge.
The question in this appeal by defendant, New Orleans Public Service, Inc. (NOPSI), is whether NOPSI can be held liable for a battery against plaintiff, which defendant's employee either caused, assisted or encouraged. We conclude NOPSI is liable and affirm.
The incident occurred on July 11, 1978. Defendant's employee, Joe Morris, Jr., was operating a bus along the Haynes Boulevard route between Elysian Fields Avenue and Paris Road on an 8:30 p. m. to 11:50 p. m. overtime shift. At approximately 10:15 p. m. the bus pulled up to the Haynes Boulevard-LaManche Street stop. As the doors opened to discharge passengers, Louis Weysham, 17 years of age at the time, pulled alongside the bus on his bicycle. Stopping on the sidewalk approximately ten feet from the open front door of the bus, he called angrily to Morris that he had nearly been struck by the bus. Morris descended from the bus to investigate, and seeing no damage to either the bicycle or the bus, turned to Weysham and accused him of throwing bottles at the bus earlier in the evening. Both parties used obscenities toward each other.
At this point the events and actions of the parties, subsequent to the verbal confrontations, differ. However, not disputed is the fact that Vincent Williams, a/k/a Lonnie Joseph, an acquaintance of Morris and a passenger in the bus, descended from the bus and stepped into the quarrel. Pulling a knife from his pocket, he slashed Weysham on the face and left forearm. Both Morris and Williams then returned to the bus, which departed and continued on its route, leaving the injured plaintiff.
In this lawsuit, plaintiff named only NOPSI as a defendant. The trial judge found NOPSI liable and awarded special damages to Weysham's father in the amount of $1,101 and general damages to Weysham in the amount of $15,000. In written reasons for judgment, the trial judge concluded that Morris and Williams "conspired and joined together in their vicious and unprovoked attack upon the plaintiff", and that Morris was acting in the course and scope of his employment.
We are confronted with two questions. The first is whether the evidence supports the trial court's conclusion that Morris, the NOPSI employee, either caused, assisted or encouraged the passenger Williams to injure Weysham. See LSA-C.C. art. 2324.[1] The second is, assuming Morris caused, assisted or encouraged Williams to injure *21 Weysham, whether Morris was exercising the functions in which he was employed when plaintiff was injured. See LSA-C.C. art. 2320.[2]

CAUSING, ASSISTING OR ENCOURAGING THE INJURY
According to plaintiff's version, while not intending a confrontation, he shouted at Morris as he was going by the bus on his bicycle and as he was preparing to turn a corner. Morris stepped off the bus to inspect for damage, but then advanced on Weysham, shaking his finger in Weysham's face and denouncing him for throwing bottles at the bus earlier that evening. Weysham testified that Morris then grabbed him and his bike, after which Williams joined the fray and punched him. He said Morris tried to kick him while he was on the ground and, as he got up and put his fist up, that's when Williams cut him. Weysham stated further that when Williams hit him, Morris was holding him "by the back". According to Weysham, Morris stood by while Williams cut him and then both assailants turned and went back to the bus.
A bus passenger, Mack Boutrin, corroborated the fact that Morris grabbed Weysham by the shoulder. Boutrin also said he saw Williams get off the back of the bus and walk toward Weysham, pulling something from his pocket. Boutrin saw Williams swing at and hit Weysham, but was unaware Weysham had been cut. According to Boutrin, during the fight the driver was next to plaintiff and facing him. After the fight, the bus driver followed Williams into the bus.
Morris, on the other hand, testified that he never touched plaintiff and was walking away from Weysham after he had told the boy not to throw things at the bus. According to Morris, by that time, however, Williams had come off the bus, dashed by Morris, saying, "I'll take care of this ..," and attacked plaintiff. At this point, Morris claims, he was going back to the bus but admits he saw Weysham and Williams arguing, shoving and fighting. Morris stated that he was on the bus when Weysham received the injury. He claims that he could not stop Williams because he didn't know what Williams was going to do. The entire incident, according to Morris, "lasted maybe forty-five seconds to a minute."
Williams stated that Morris was standing behind him and plaintiff while they were fighting. He indicated that Morris was standing near plaintiff and Williams when Williams cut plaintiff and that Morris made no attempt to stop him.
Although the evidence is contradictory regarding the participation of each party in the incident, Morris nonetheless admitted that plaintiff was "pushing off" on the bicycle, apparently attempting to leave, after accusing Morris of almost hitting him with the bus.
In determining whether Morris and Williams were acting in concert when plaintiff's injury occurred, it is important to understand the relationship between the bus driver and the assailant. Morris and Williams had lived in the same neighborhood and knew each other for approximately three years prior to the July 11th incident. Earlier in the evening on the night that Weysham was cut, and while Williams was a fare-paying passenger on the bus, Morris had asked him to remain on the bus to the end of the run in order that Williams could drive Morris' car from the terminal point to the bus barn to pick him up since Morris had to drive the bus back to the barn. There is some slight indication that Morris had invited Williams to assist him in the event that he had any trouble on the *22 route, because people had been throwing bottles at the bus and cursing him. Williams testified that Morris told him about the earlier throwing incidents but denied that he was asked by Morris to ride the bus for protection.
The trial judge concluded, that, at the least, Morris was acquainted with Williams' criminal record and "propensity for crime and violence", and that both men anticipated and were prepared for any disturbance. The record supports the trial court's conclusion that Morris was aware of Williams' tendency to get into trouble. Morris was extremely evasive when asked whether he was aware, before the incident, that Williams had a criminal record or "had been in trouble." He stated that he had lived in the same neighborhood and knew Williams for about three years. Morris indicated that he learned of Williams having been "in trouble with the law" from Williams' father or neighbors but did not know of any specific involvement with the "law." According to Williams, he previously had been arrested for assault and battery and "a couple of aggravated burglaries", and had been involved in several knife fights. He stated that Morris did not know of his history of knife fights or his trouble "with the law" but that Morris had seen police pick him up at his house.
The resolution of the question whether Morris caused, assisted, or encouraged Williams' unlawful act involves a credibility determination of Morris' involvement in the incident. The trial judge concluded that the critical part of Morris' testimony was "unbelievable, improbable, and in part untrustworthy". He further stated that he accepted as true plaintiff's version of the incident. Because we conclude the record supports the trial judge's determination based on a credibility finding, we cannot say he manifestly erred or was clearly wrong.
We conclude, therefore, the evidence establishes that Morris caused, assisted and encouraged Williams to inflict injury on Weysham. Accordingly, we agree with the trial judge that Morris was equally culpable with Williams for plaintiff's injuries. LSA-C.C. art. 2324; See also Miller v. Keating, 339 So.2d 40 (La.App. 3rd Cir. 1976), amended on other grounds and affirmed, 349 So.2d 265 (La.1977); Tabb v. Norred, 277 So.2d 223 (La.App. 3rd Cir. 1973), writ denied 279 So.2d 694.

VICARIOUS LIABILITY OF NOPSI
The second issue is whether Morris was acting in the function in which he was employed at the time the accident occurred. See LSA-C.C. 2320. Liability cannot attach to NOPSI unless the tort was committed within the course and scope of employment. LeBrane v. Lewis, 292 So.2d 216 (La.1974). Whether an employee was so acting must be decided on the facts of each case; the test is whether the employee is performing some function for his employer which he was employed to perform. Orgeron v. Sweatman, 367 So.2d 1199 (La. App. 4th Cir. 1978), writ denied, Cheramie v. Sweatman, 371 So.2d 615 (La.1979). See also Normand v. City of New Orleans, 363 So.2d 1220 (La.App. 4th Cir. 1978), writ denied 366 So.2d 573 (La.1979).
It is clear from the evidence that Morris was acting in the course of his employment at the time of the incident; however, the more difficult question is whether he was acting in the scope of his employment when Weysham was cut. The relevant consideration is whether Morris' action was so closely connected in time, place, and causation to his employment duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared to conduct motivated by purely personal considerations entirely extraneous to the employer's interest. LeBrane v. Lewis, supra. In the LeBrane case, the Supreme Court concluded the violence was "primarily employment rooted" and was "reasonably incidental" to the performance of the employee's duties. Our consideration of the facts in the instant case leads us to a similar conclusion.
The evidence here shows Morris was somewhat anxious because he had had trouble early in the evening with adolescents throwing bottles at the bus and cursing *23 him. He had related the incidents to Williams and expressed concern over a possible recurrence on the final run. According to Morris, he had told the bus passengers to be careful because of trouble earlier with "guys" throwing things at the bus. Morris' descent from the bus and confrontation of Weysham were partially actuated by his belief that Weysham was one of the troublemaking adolescents, and also were partially to ascertain (according to Morris) whether Weysham had been injured, or the bike or the bus damaged.
Nonetheless, we conclude that Morris was acting in the scope of his employment when he initially stepped from the bus to investigate the damage after Weysham had told him he was almost struck by the bus. He was also acting within the scope of his employment in warning Weysham to stop throwing bottles at the bus. Although he became angry when Weysham cursed him and he grabbed Weysham, precipitating Williams' attack, we believe this conduct was related closely enough to his furtherance of his employer's interests (i. e., protection of the bus and passengers) to be regarded as a risk of harm fairly attributable to the employer's business. Accordingly, we conclude NOPSI is vicariously liable for the tortious behavior of Morris under LSA-C.C. articles 2320 and 2324.

QUANTUM
Finally, we reject NOPSI's claim that the $15,000 general damage award is excessive. Immediately following the incident, Weysham was taken to Methodist Hospital, where he was hospitalized for three days. Because of a serious loss of blood plaintiff required a three-unit blood transfusion. The facial injuries resulted in severe scarring.
By joint agreement of all counsel, the facial lacerations and remaining scars were graphically described as follows: There is a scar on the top surface of plaintiff's left forearm, approximately four inches in length and approximately one-quarter inch wide; the scar has no height, but is tough to the touch. There is also a scar on the left forehead extending in a vertical direction from the middle left eyebrow. This scar is jagged and resembles the figure five, and extends back into the hairline approximately an inch and one-half over the eyebrow. An additional scar on the bridge of the nose extends from the middle of the bridge down to a point approximately three-quarters of an inch below and to the middle from the inside corner of the left eye. The nose scar is somewhat faded; however, the scar on the forehead is still very apparent as is the scar on the forearm.[3]
According to Weysham, his recuperation required approximately two months, but he was unable to return to construction work for approximately three and one-half months after the injury. Weysham testified further that because of the profuse bleeding and weakness suffered from the loss of blood, he feared imminent death. Considering plaintiff's pain, suffering, scarring, disfigurement and mental anguish, we do not find the $15,000 general damage award to be an abuse of the trial court's discretion. See Reck v. Stevens, 373 So.2d 498 (La.1979).
It is NOPSI's contention, however, that Weysham's verbal abuse of Morris was calculated to provoke and arouse Morris' retaliation and requires mitigation of the damages, necessitating a substantial reduction. We do not find in the trial judge's reasons for judgment any reference to a mitigation of damages. We conclude, therefore, the general damage award did not include any mitigation of the amount.
As pointed out by NOPSI, the Louisiana Supreme Court in Morneau v. American Oil Company, 272 So.2d 313 at 316 (La.1973), citing earlier cases, recognized that provocation by words can be considered in mitigation of damages. The Morneau court *24 applied the rule that mitigation can be considered where the words "are calculated to provoke and arouse to the point of physical retaliation ..." In Skains v. Tidwell, 359 So.2d 247 at 249 (La.App. 2nd Cir. 1978) the court concluded that an abusive verbal attack on a party's "veracity and lineage, in the context of the parties' previous unpleasant encounters, was calculated to provoke plaintiff's physical retaliation."
Applying the test and examples set forth in Morneau and Skains, we conclude that the verbiage in Weysham's initial confrontation of Morris was not such as to provoke and arouse Morris' physical retaliation. According to Morris, Weysham stated to him "you tried to hit me with that f___ing bus." The record does not disclose any additional verbal abuse by Weysham after Morris disembarked from the bus and argument ensued. Under the circumstances, we determine that mitigation of damages is not applicable.
Having so concluded, we affirm the judgment of the trial court.
AFFIRMED.

SCHOTT, J., dissents and assigns reasons.
SCHOTT, Judge, dissenting.
I respectfully disagree with my colleagues and the trial judge that defendant is vicariously liable for its bus driver's tort. LSA C.C. Art. 2320 makes employers liable "for the damage occasioned by their servants ... in the exercise of the functions in which they are employed." In this case, Morris left his bus to engage in an altercation with plaintiff because plaintiff had provoked him. I see no connection between Morris's function as a bus driver, including the protection of his bus and passengers, and his getting off the bus to engage *25 in a fight with the plaintiff on his bicycle after being provoked by plaintiff's insults. Even if there was some connection between plaintiff and the bottle throwing incident which occurred earlier it was likewise beyond the functions of his employment for Morris to leave his bus and somehow punish or threaten plaintiff in connection with that earlier incident. The safety of his bus and passengers was not jeopardized at that time, and the only function in which he was employed at that time was to drive on with the bus and passengers.
The foregoing analysis is based on the facts as viewed most favorably from plaintiff's point of view because it ignores the fact that plaintiff's real injuries were caused not by Morris, but by Lonnie Williams, a passenger. In order to find vicarious liability here we must conclude that it was within Morris' functions as a bus driver to cause, assist, or encourage Williams to commit a felonious attack on plaintiff who was outside of the bus because Morris was either angry at being cursed or intent on punishing plaintiff for the suspected bottle throwing, which occurred an hour earlier.
LeBrane v. Lewis, 292 So.2d 216 (La.1974) is distinguishable. There, the employee's tortious conduct occurred "while the employee was at least partly actuated by his purpose of acting for his employer in the discharge of the recalcitrant employee .. and it was reasonably consequent upon or incident to his performance of his employment function of hiring and firing sub-employees..." I do not agree that the present case meets this test.
I have also compared this case with Jones v. Sights and Sounds, Inc., 365 So.2d 15 (La.App. 4th Cir. 1978) which is likewise distinguishable. There the tortious conduct occurred while the employees were engaged in the collection of a rental fee from plaintiff after delivering a television set to plaintiff's home where the assault by the employees on plaintiff took place.
I would reverse the judgment of the trial court.
NOTES
[1] LSA-C.C. article 2324 reads as follows:

"Art. 2324. He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act."
[2] LSA-C.C. article 2320 reads as follows:

"Art. 2320. Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.
In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it."
[3] We attach a photograph of plaintiff showing the lacerations and mark the photograph Appendix 1.